**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**March 9, 2021**

**FOR THE TENTH CIRCUIT**
_____

THEWODROS WOLIE BIRHANU, a/k/a
Thewodros Birhanu,

    Petitioner,

v.

ROBERT M. WILKINSON,* Acting
Attorney General of the United States,

    Respondent.

No. 19-9599

_____

**Petition for Review from the**
**Board of Immigration Appeals**
_____

Tania N. Valdez (Christopher N. Lasch, with her on the briefs), University of Denver
Sturm College of Law, Immigration Law & Policy Clinic, Denver, Colorado, appearing
for Petitioner.

Vanessa M. Otero, Trial Attorney, Office of Immigration Litigation (Joseph H. Hunt,
Assistant Attorney General, Civil Division, and Anthony P. Nicastro, Assistant Director,
Office of Immigration Litigation, with her on the brief), United States Department of
Justice, Washington, DC, appearing for Respondent.
_____

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **BACHARACH**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.

_____

    * On January 20, 2021, Robert M. Wilkinson became Acting Attorney General
of the United States. Consequently, his name has been substituted for William P. Barr
as Respondent, per Fed. R. App. P. 43(c)(2).

_____

Thewodros Wolie Birhanu petitions for review of a final order of removal issued by the Board of Immigration Appeals ("BIA"). The BIA dismissed Mr. Birhanu's appeal from the decision of the Immigration Judge ("IJ") finding him removable. The BIA and the IJ ruled that Mr. Birhanu was removable as an alien convicted of two or more crimes involving moral turpitude ("CIMTs") not arising out of a single scheme of criminal misconduct, that he was not entitled to asylum or withholding of removal because his convictions qualified as particularly serious crimes, and that he was not entitled to relief under the Convention Against Torture ("CAT"). Exercising jurisdiction under 8 U.S.C. § 1252(a), we dismiss his claims under Section 504 of the Rehabilitation Act as unexhausted and deny the balance of his petition for review on the merits.

**I**

Mr. Birhanu is a citizen of Ethiopia. In 2007, he was admitted to the United States as a lawful permanent resident. Mr. Birhanu also has a history of paranoid schizophrenia. Although the record is unclear, Mr. Birhanu may have had his first psychotic break as early as 1999, while living in Ethiopia. *See* AR at 988; *but see* AR at 135 (Mr. Birhanu testifying he first noticed his symptoms in 2007). After receiving lawful permanent resident status, Mr. Birhanu visited Ethiopia on at least two occasions. Both times, Mr. Birhanu's family sent Mr. Birhanu to a church for "holy water treatment" for his mental illness. Both times, Mr. Birhanu was physically and mentally abused, including being bound, hit, and isolated. Mr.

Birhanu was also struck by Ethiopian police when he sought help. When residing in the United States, Mr. Birhanu is able to manage his illness with prescription medication. He is unable to receive similar care in Ethiopia, however, where there is only one mental hospital and where his prescription medication is unavailable.

In December 2016, Mr. Birhanu suffered a psychotic episode. At the time, Mr. Birhanu was a student at Weber State University. During this episode, on December 21, Mr. Birhanu made threatening comments before entering a university administration building, placing the university community in fear for their lives. In response, the university was forced to lock down the building. On December 24, Mr. Birhanu sent a threatening email to a university employee, stating he would kill and dismember people should the university not meet his demands. Both instances occurred during the same psychotic episode, and both were precipitated by Mr. Birhanu's ongoing dispute with the university over separate student code charges.

Mr. Birhanu was arrested and charged in the Second Judicial District Court of Weber County, Utah, with making threats of terrorism in violation of Utah Code Ann. § 76-5-107.3(1)(b)(ii), a third-degree felony. The state court initially found Mr. Birhanu not competent to stand trial, but later found him restored to competency after treatment at a state hospital. Mr. Birhanu subsequently pled "guilty but mentally ill" to two counts of making threats of terrorism. AR at 942. The state court sentenced Mr. Birhanu to an indeterminate term not exceeding five years, suspended his sentence, and credited him for 596 days previously served. *Id.* at 946.

3

After Mr. Birhanu's release from state custody for his state court convictions, the Department of Homeland Security initiated removal proceedings against him, alleging he was removable as an alien "convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct," pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii). AR at 1039. Mr. Birhanu appeared pro se before the IJ. The IJ held a competency hearing, during which the IJ questioned Mr. Birhanu, but did not appoint counsel or order an expert psychiatric evaluation. Upon being satisfied after its inquiries, the IJ found Mr. Birhanu competent to proceed. The IJ subsequently ordered Mr. Birhanu removable as an alien convicted of two CIMTs not arising from a single scheme of criminal misconduct. In a separate order, the IJ also denied Mr. Birhanu's requests for asylum, withholding of removal, and protection under the CAT. As regards his requests for asylum and withholding of removal, the IJ ruled he was ineligible for relief because he had been convicted of a particularly serious crime. The IJ noted Mr. Birhanu's mental health was considered by the criminal court, but the criminal court determined he was guilty of making threats of terrorism and his mental health did not exculpate him.

Mr. Birhanu appealed the IJ's orders to the BIA. The BIA, acting through a single commissioner, affirmed the IJ. Mr. Birhanu has filed a timely petition for review with this court.

## II

We have jurisdiction under 8 U.S.C. § 1252(a) because the BIA's order denying relief from removal is an appealable final order of removal. *Sosa-*

4

*Valenzuela v. Holder*, 692 F.3d 1103, 1108 (10th Cir. 2012). Our review of a final order of removal is limited to constitutional claims or questions of law because eligibility for relief from removal is ordinarily an unreviewable matter of discretion under 8 U.S.C. § 1252(a)(2)(C) & (D). *Id.* at 1108–09. We therefore review the BIA's legal determinations de novo, but we do not ordinarily review its exercise of discretion. *Id.* at 1109.

In contrast, denial of CAT relief is not a "final order of removal"; thus, a CAT order is reviewed for substantial evidence. *Nasrallah v. Barr,* 140 S. Ct. 1683, 1688 (2020). Under the substantial evidence standard, "[t]he agency's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 1692.

### III

Mr. Birhanu presents four arguments in his petition for review: 1) the IJ denied him due process "by requiring him to proceed pro se in immigration court without procedures adequate to assure his competency." Pet'r's Br. at 9; 2) the BIA erred in concluding that his convictions were CIMTs not arising out of a single scheme of misconduct. *Id.* at 15, 18; 3) the BIA acted arbitrarily and capriciously in refusing to consider his mental health in its "particularly serious crime" determination. *Id.* at 21; and 4) the BIA failed to consider evidence in support of his application for CAT relief. *Id.* at 27.

## A. Safeguards to Assure Competency

### 1. Fundamental Due Process

As a preliminary matter, Mr. Birhanu's challenge to the IJ's competency proceedings are reviewable by this court. To be clear, Mr. Birhanu does not challenge the competency *finding*, but rather he contends "[t]he competency *hearing* was constitutionally deficient . . . ." Pet'r's Reply at 19 (emphasis added); *see also* Pet'r's Br. at 9 (asserting the competency hearing lacked "procedures adequate to assure his competency"). This court has jurisdiction to review whether "removal proceedings violated [a petitioner's] Fifth Amendment due process rights because he [was] mentally incompetent." *Brue v. Gonzales*, 464 F.3d 1227, 1231 (10th Cir. 2006). Accordingly, we consider Mr. Birhanu's petition to the extent he challenges the safeguards implemented by the IJ, as opposed to the IJ's final competency findings.

The IJ's competency proceedings did not violate Mr. Birhanu's due process rights. "An alien in removal proceedings is entitled only to the Fifth Amendment guarantee of fundamental fairness." *Schroeck v. Gonzales,* 429 F.3d 947, 952 (10th Cir. 2005). Thus, an alien facing removal is entitled "only to procedural due process, which provides the opportunity to be heard at a meaningful time and in a meaningful manner." *Brue,* 464 F.3d at 1233 (quoting *Schroeck*, 429 F.3d at 952). "[A]n allegation of wholesale failure to consider evidence implicates due process," and is thus within our jurisdiction to review. *Alzainati v. Holder*, 568 F.3d 844, 851 (10th Cir. 2009). In contrast, "a quarrel about the level of detail required in the BIA's

6

analysis" does not implicate due process and thus lies beyond our jurisdiction. *Id.* Further, "[t]o prevail on a due process claim, an alien must establish not only error, but prejudice." *Id.*

Our cases do not articulate what precisely an IJ must do to assure itself of an alien's competency. In *Brue,* we recognized that "the statute [8 U.S.C. § 1229a(b)(3)] and the regulation [8 C.F.R. § 1240.4] facially appear to require *no* procedural safeguards if an unrepresented, mentally incompetent alien is nevertheless able to be present at his removal proceeding." 464 F.3d at 1233 (emphasis added). But in that case we declined to define what procedural safeguards the Fifth Amendment requires because Mr. Brue was represented by counsel. We concluded the fact that he was represented cured any potential due process violation. By contrast, Mr. Birhanu appeared pro se at his removal hearing.

In *Matter of M-A-M-*, the BIA described a number of measures an IJ may take to assess an alien's competency. 25 I. & N. Dec. 474, 480–81 (BIA 2011). One such measure would be to modify the questions posed by an immigration judge, such as including "questions about where the hearing is taking place, the nature of the proceedings, and the [alien's] state of mind." *Id.* at 480. The immigration judge may also order a mental health competency evaluation by a psychiatrist. *Id.* at 481 (citing *Matter of J-F-F-*, 23 I. & N. Dec. 912, 915 (A.G. 2006)). The BIA does not require the immigration judge to take any particular measures, but does require the immigration judge to "weigh the results from the measures taken and determine . . .

whether the [alien] is sufficiently competent to proceed with the hearing without safeguards." *Id.*

Here, the IJ took sufficient measures as contemplated in *Matter of M-A-M-*. In at least two separate hearings, the IJ asked Mr. Birhanu competency-related questions to determine whether he understood the nature of the proceedings. *See* AR at 131–55 (September 20, 2018 hearing); AR at 171–90 (November 26, 2018 hearing). Mr. Birhanu informed the IJ that he understood the proceedings were to "decide whether [he] can stay here legally or not." AR at 134. He also testified that he could manage his diagnosis with medication. AR at 152, 180. Nor did the IJ rely solely on Mr. Birhanu's testimony; the IJ also considered Mr. Birhanu's medical records and a letter submitted by his social worker. AR at 111; *see also* AR at 990 (psychologist report concluding "Mr. Birhanu has found psychotropic medications that treat his symptoms"). The IJ, recognizing "mental competency is not a static condition," also continued to evaluate Mr. Birhanu's competency at subsequent proceedings. AR at 111.

The IJ also did not ignore evidence that pertained to Mr. Birhanu's competency. In fact, the record reveals that the IJ expressly considered the same evidence Mr. Birhanu claims it "ignored." For example, Mr. Birhanu points to his testimony to show that he "expressed confusion, repeated himself, and told the IJ that he hears voices that 'disturb my thinking process.'" Pet'r's Reply at 19. Yet, the IJ described Mr. Birhanu's demeanor at the hearing as "lucid, cogent, and responsive during questioning." AR at 110. Similarly, Mr. Birhanu asserts that the IJ ignored

8

the opinion expressed by his social worker, whose letter explained Mr. Birhanu's difficulty in completing his applications for relief. *See* Pet'r's Reply at 19. Yet, the IJ described that letter during the hearing, and in fact held an additional hearing to assure itself of Mr. Birhanu's competency. AR at 111, 173. In short, the record shows the IJ carefully considered any competency issues presented in this case, allowing Mr. Birhanu to be heard "at a meaningful time and in a meaningful manner." *Brue*, 464 F.3d at 1233.

## 2. Section 504 of the Rehabilitation Act

We decline to address Mr. Birhanu's alternative argument that he was entitled to appointment of counsel under Section 504 of the Rehabilitation Act of 1973 because his Section 504 claim is unexhausted. An alien challenging a removal order must have "exhausted all administrative remedies available." 8 U.S.C. § 1252(d)(1). "[P]resenting a *conclusion* or *request for relief* to the BIA isn't enough to exhaust every potential *argument* for reaching that conclusion or winning that relief." *Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1238 (10th Cir. 2010) (Gorsuch, J.) (emphasis in original). Thus, to exhaust his claims, an alien has "a duty to present to the BIA all of his specific legal theories for reversal." *Id.*

In his appeal to the BIA, Mr. Birhanu, in a footnote, cited Section 504 and a case from the Central District of California, stating that he "preserves a Section 504 claim." AR at 19. He later also stated that he "should have been provided safeguards . . . pursuant to *Matter of M-A-M-* and Section 504 of the Rehabilitation Act." AR at 22. Mr. Birhanu's two citations to Section 504, without specifically explaining why

9

Section 504 entitles him to relief, did not fairly present his legal theory to the BIA.

Thus, we dismiss this claim as unexhausted.[1]

## B. Removability Under 8 U.S.C. § 1227(a)(2)(A)(ii)

Mr. Birhanu next asserts that the BIA erred in concluding that he was removable as an alien convicted of two or more CIMTs not arising out of a single scheme of criminal misconduct. Mr. Birhanu asserts that his convictions were not for CIMTs because his offense required only reckless threatening. He also asserts that his convictions arose from a single scheme because they were made in pursuit of the same goal, and because his mental illness prevented him from disassociating or reflecting after committing the first threat and before committing the second.

## 1. "Crimes Involving Moral Turpitude"

"Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable." 8 U.S.C. § 1227(a)(2)(A)(ii). In light of the "nebulousness of moral turpitude," the BIA's interpretation of that term is entitled to *Chevron* deference, "as long as it reflects a reasonable policy choice for the agency to make." *De Leon v. Lynch*, 808 F.3d 1224, 1228 (10th Cir. 2015) (discussing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984)). The

---

[1] Even if the Section 504 claim could be considered, it is without merit. Mr. Birhanu fails to show why his medication, which the IJ specifically inquired into and which Mr. Birhanu testified helped manage his symptoms, was an insufficient accommodation.

BIA's interpretation must also be made in its lawmaking capacity—i.e., it must be itself precedential or rely on a precedential decision "addressing the *same* question." *Flores-Molina v. Sessions*, 850 F.3d 1150, 1158 (10th Cir. 2017) (emphasis in original). If *Chevron* deference is unwarranted, the BIA's interpretation is entitled to *Skidmore* deference if it has "the power to persuade." *Id.* (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). However, no deference is accorded to the BIA's interpretation of "the substance of the state or local offense at issue." *Id.* at 1157 (citing *Efagene v. Holder*, 642 F.3d 918, 921 (10th Cir. 2011)). In this case, we need not decide whether the BIA's decision is entitled to deference because we independently conclude that Mr. Birhanu's convictions were for CIMTs not arising out of a single scheme of criminal misconduct.

Mr. Birhanu's convictions were for CIMTs. Under the "categorical approach," determining whether an alien's offense is a CIMT "requires ignoring a petitioner's actual conduct and examining only the minimum conduct needed for a conviction under the relevant state or local law." *Flores-Molina*, 850 F.3d at 1158. "Moral turpitude reaches conduct that is inherently wrong, or *malum in se,* rather than conduct deemed wrong only because of a statutory proscription, *malum prohibitum.*" *Efagene*, 642 F.3d at 921. In addition to requiring conduct that entails a "reprehensible act," a CIMT also "necessarily involves an evil intent or maliciousness in carrying out the reprehensible act." *Id.* at 921–22; *see also Flores-Molina,* 850 F.3d at 1159 (CIMT requires "some form of scienter"). "Corrupt scienter is the touchstone of moral turpitude." *De Leon,* 808 F.3d at 1228.

11

Here, Mr. Birhanu was convicted under Utah's terrorist threat statute, which provides:

> (1) A person commits a threat of terrorism if the person threatens to commit any offense involving bodily injury, death, or substantial property damage; and . . .
>
> (b) acts with intent to: . . .
>
> (ii) prevent or interrupt the occupation of a building or a portion of the building, a place to which the public has access, or a facility or vehicle of public transportation operated by a common carrier.

Utah Code Ann. § 76-5-107.3(1)(b)(ii).

As the statute's language makes clear, and as the parties agree, the statute requires actual intent to "prevent or interrupt the occupation of a building." The statute does not, however, clearly define the mens rea required when "threaten[ing] to commit any offense involving bodily injury, death, or substantial property damage." Because the statute does not define the requisite mens rea, "intent, knowledge, or recklessness shall suffice to establish criminal responsibility." Utah Code Ann. § 76-2-102; *State v. Vigil*, 448 P.3d 738, 741 (Utah Ct. App. 2019) (recognizing same). Accordingly, under the categorical approach, the minimum conduct required to convict is reckless threatening to commit any offense involving substantial property damage and acting with intent to interrupt the occupation of a portion of a building. *See Vigil*, 448 P.3d at 741 & n.2 (Utah's obstruction of justice statute requires acting "recklessly," and "with intent to" cause a certain result).

In at least two unpublished decisions, this court has recognized that reckless conduct coupled with an "aggravating factor" constitutes a CIMT. Although these decisions are not precedential, we discuss them for their persuasive value. 10th Cir. R. 32.1. In *Marin-Gonzales v. Sessions,* 720 F. App'x 496 (10th Cir. 2018) (unpublished), this court recognized that "in the absence of any aggravating factors, reckless offenses typically don't constitute CIMTs." 720 F. App'x at 498. The *Marin-Gonzales* panel declined to apply that principle, however, because the petitioner's conviction for attempted public assistance fraud could not be committed recklessly. Similarly, in *Garcia v. Lynch*, 668 F. App'x 843 (10th Cir. 2016) (unpublished), this court recognized that an offense that "categorically permits a conviction based only on 'recklessly' assaulting a person, without a further requirement of the infliction of 'serious bodily injury'" would "likely not constitute a CIMT." 668 F. App'x at 844. But the *Garcia* panel also declined to apply that principle and instead remanded to the BIA to determine whether the statute at issue was divisible, and thus whether the alien's conviction may have required more than recklessness. Both *Garcia* and *Marin-Gonzales* relied upon the same BIA decision— *Matter of Fualaau*, 21 I. & N. Dec. 475 (BIA 1996). There, the BIA recognized that "[s]imple assault is not considered to be a crime involving moral turpitude." 21 I. & N. Dec. at 477. In contrast, assault with a deadly weapon or assault on a peace officer are CIMTs. *Id.* at 477–78.

We also note that two other circuits, when reviewing terroristic threat statutes from other states, have concluded that violations of those statutes are CIMTs. In

13

*Chanmouny v. Ashcroft,* 376 F.3d 810 (8th Cir. 2004), the Eighth Circuit held that

violation of Minnesota's terrorist threat statute is a CIMT.  The Minnesota statute

made it a crime to "threaten[], directly or indirectly, to commit any crime of violence

with purpose to terrorize another."  Minn. Stat. § 609.713, subd. 1.  The Eighth

Circuit reasoned that:

> [T]he crime at issue in this case—threatening a crime of
> violence against another person with the purpose of causing
> extreme fear—[like aggravated stalking] falls within the
> category of offenses requiring a vicious motive or evil intent.
> This requisite intent to terrorize also serves to distinguish
> Chanmouny's offense from simple assault, which the BIA
> and various courts have declined to classify as a crime of
> moral turpitude.  Simple assault typically is a general intent
> crime, and it is thus different in character from those offenses
> that involve 'a vicious motive, corrupt mind, or evil intent.'

*Chanmouny*, 376 F.3d 814–15.

The Eighth Circuit, relying on *Chanmouny*, later held that even threats made

with "reckless disregard of the risk of causing terror" satisfy the scienter requirement

for CIMTs.  *Avendano v. Holder*, 770 F.3d 731, 734–36 (8th Cir. 2014).

In *Javier v. Attorney General*, 826 F.3d 127 (3d Cir. 2016), the Third Circuit

followed *Chanmouny,* and held that violation of Pennsylvania's terroristic threat

statute is a CIMT.  The Pennsylvania statute stated that "[a] person commits the

crime of terroristic threats if the person communicates, either directly or indirectly, a

threat to: [] commit any crime of violence with intent to terrorize another."  18 Pa.

Cons. Stat. § 2706(a)(1).  The Third Circuit held that the Pennsylvania statute's

"specific intent requirement," i.e., "with intent to terrorize another," made the offense

14

a CIMT. *Javier,* 826 F.3d at 131. The court explained that its focus in determining whether a statute is categorically a CIMT "is not the threatened 'crime of violence,' but the communication of the threat and its requisite scienter." *Id.* The Third Circuit recognized that threatening to commit an offense is "of a different character" than the underlying offense, because the specific intent to terrorize evinces a "vicious motive or a corrupt mind." *Id.* at 131–32; *but see Larios v. Att'y Gen.,* 978 F.3d 62, 71 n.4 (3d Cir. 2020) (New Jersey terroristic threat statute is not a CIMT because it only criminalized "reckless threats," without requiring "a specific intent to terrorize").

We hold that recklessly threatening substantial property damage with the intent of interrupting public access to a portion of a building is a CIMT. The threat combined with the intended result to interrupt access constitutes a "reprehensible act." General recklessness combined with a specific intent to interrupt building access constitutes an "evil intent." *Efagene*, 642 F.3d at 921–22; *Matter of Salad*, 27 I. & N. Dec. 733, 735 (BIA 2020) ("Crimes that require specific intent are more likely to be considered to involve moral turpitude because they are committed with the evil intent or depraved mind associated with moral turpitude."). Although recklessness generally does not give rise to a CIMT, our precedent only requires "some form of scienter." *Flores-Molina,* 850 F.3d at 1159. And although our unpublished decisions describing aggravating factors have generally focused on the reprehensible act, such as causing serious bodily injury or death, our precedent requires us to consider both the reprehensible act and the evil intent. *Efagene*, 642 F.3d at 921.

15

In this case, the specific intent requirement of the Utah terroristic threat statute sufficiently "aggravates" the offense, such that the statute requires a "vicious motive or corrupt mind." *Javier*, 826 F.3d at 131–32; *see also Chanmouny*, 376 F.3d at 814 (Minnesota statute requires a "vicious motive or evil intent"). We recognize that Utah's terroristic threat statute, unlike its Minnesota or Pennsylvania analogues, does not require an "intent to terrorize another." All three statutes, however, require some wrongful *intent*, even though the intended *result* may differ. This wrongful intent is the "touchstone of moral turpitude." *De Leon*, 808 F.3d at 1228. Further, threats, whether made intentionally or recklessly, are harmful because of the fear and distress they may cause. *See Javier*, 826 F.3d at 131 (recognizing the "psychological distress that follows from an invasion of another's sense of personal security"). Thus, considering both elements of the Utah terroristic threat statute collectively (the intent required and the result intended), we conclude Mr. Birhanu's commission of this offense involved acts of moral turpitude.

## 2. "Not Arising out of a Single Scheme of Criminal Misconduct"

Mr. Birhanu also contends his convictions arose from a single scheme of criminal misconduct. The phrase "single scheme of criminal misconduct" "refers to acts, which although separate crimes in and of themselves, were performed in furtherance of a single criminal episode, such as where one crime constitutes a lesser offense of another or where two crimes flow from and are the natural consequence of a single act of criminal misconduct." *Nguyen v. I.N.S.,* 991 F.2d 621, 623 (10th Cir. 1993).

16

In *Nguyen,* this court held that shooting a police officer and possession of a stolen vehicle were not part of a single scheme because at the time of the shooting, the alien was "merely in the process of enjoying his ill-gotten gains [i.e., the stolen car]." *Id.* at 625. We relied on the BIA's prior decision in *Matter of Adetiba,* 20 I. & N. Dec. 506 (BIA 1992). There, the BIA held that multiple fraudulent uses of different credit cards were not part of single scheme because "[t]he further use of other credit cards to obtain additional things of value was not necessary to the success in obtaining things of value from any one individual card." *Id.* at 512. The panel in *Nguyen* and the BIA in *Adetiba* both cited favorably a First Circuit decision, in which that court held that two breaking and entering incidents which occurred during an alien's continuous drinking binge were not committed pursuant to a single scheme. *Pacheco v. I.N.S.,* 546 F.2d 448, 452 (1st Cir. 1976), *cert. denied*, 430 U.S. 985 (1977).

Mr. Birhanu's two threats separated by three days did not flow from one another and were not the "natural consequence of a single act of criminal misconduct." *Nguyen,* 991 F.3d at 623. On December 21, 2016, Mr. Birhanu made threatening comments before entering a public building, causing the building to be locked down. AR at 113. On December 24, 2016, Mr. Birhanu sent a threatening email to a university employee. *Id.* The single scheme inquiry "refers to acts," *Nguyen,* 991 F.3d at 623, and Mr. Birhanu's threats, made on different days to different persons, and communicated in different ways, were two distinct acts.

17

Whether Mr. Birhanu's convictions arose from a single criminal "purpose" or "objective" does not affect our analysis. We have previously rejected similar arguments which focused on the defendant's underlying motivation for his actions. *Nguyen,* 991 F.2d at 625 (shooting officer hours after car theft was not part of a single scheme); *see also Adetiba*, 20 I. & N. Dec. at 512 ("[I]t is of no consequence that the respondent's separate crimes of unauthorized use of a credit card with intent to defraud . . . were committed pursuant to an elaborate plan and that the modus operandi was the same in each instance."). Mr. Birhanu's argument is similar to the rationale adopted by the Ninth Circuit that "takes a more inclusive view of 'single scheme,' and requires only a common plan or intent pursuant to which multiple crimes are committed." *Nguyen*, 991 F.2d at 625 (discussing *Gonzalez-Sandoval v. INS*, 910 F.2d 614, 616 (9th Cir. 1990)). Yet this court in *Nguyen* rejected that approach and declined to follow the Ninth Circuit. *Id.*

Mr. Birhanu's ongoing mental illness also does not affect whether his two convictions were the "natural consequence of a single act of criminal misconduct." *Nguyen,* 991 F.2d at 623. As described above, this circuit's "single scheme" inquiry focuses on the alien's acts. An alien's opportunity to "disassociate and reflect" may be relevant in determining whether two criminal events are really a single "act." *See Adetiba,* 20 I. & N. Dec. at 509–10 ("[T]o be a 'single scheme,' the scheme must take place at one time, meaning there must be no substantial interruption that would allow the participant to disassociate himself from his enterprise and reflect on what he has done."). Here, however, three days separated Mr. Birhanu's threats. Thus, although

18

Mr. Birhanu's mental illness may have prevented him from personally disassociating and reflecting, his mental illness does not alter the fact that the two threats are temporally distinct acts, nor does it result in our concluding that the two threats arose from a "single scheme." Accordingly, we conclude that the BIA correctly ruled that Mr. Birhanu was removable as an alien convicted of two or more CIMTs not arising from a single scheme of criminal misconduct.

### C. Withholding of Removal Under 8 U.S.C. § 1231(b)(3)(B)(ii)

Mr. Birhanu next asserts that the BIA applied the wrong legal standard in determining whether his convictions were for "particularly serious crimes," and thus whether he was eligible for withholding of removal. The BIA here, in affirming the IJ, relied on its prior decision in *Matter of G-G-S-*, 26 I. & N. Dec. 339 (BIA 2014). In *Matter of G-G-S-*, the BIA held that an alien's mental health is not a factor to be weighed in determining whether the crimes violated are particularly serious. Mr. Birhanu claims that the BIA's holding in *Matter of G-G-S-* unreasonably conflicts with its prior holding in *Matter of N-A-M-* that an immigration judge may consider "all reliable evidence," and is thus arbitrary and capricious.

*Matter of G-G-S-* is a precedential BIA opinion addressing the "same question" Mr. Birhanu raises: whether an IJ may consider an alien's mental health in its particularly serious crime analysis. Thus, we first consider whether the BIA's decision is entitled to deference. *See Flores-Molina*, 850 F.3d at 1157–58 (discussing *Chevron*, 467 U.S. 837). Under *Chevron*, we defer to the BIA's construction of § 1231 so long as the statute is "silent or ambiguous" on the question

19

at issue, and so long as the BIA's construction is not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 842–45; *N-A-M v. Holder*, 587 F.3d 1052, 1056 (10th Cir. 2009) ("[T]he BIA or the Attorney General is authorized to develop a reasonable construction [of 'particularly serious' crime under] § 1231 to which we defer under *Chevron*."). We uphold the agency's reasonable interpretation of an ambiguous statute, even if the agency's interpretation "differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

"An unexplained deviation from past practice can render an agency's decision arbitrary and capricious, but inconsistency with past practice 'is not a basis for declining to analyze the agency's interpretation[s].'" *WildEarth Guardians v. EPA*, 770 F.3d 919, 941 (10th Cir. 2014) (quoting *Brand X*, 545 U.S. at 981). Accordingly, the BIA does not need to show that "the reasons for the [alleged] new policy are *better* than the reasons for the old one; it suffices that the [alleged] new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (emphasis in original).

If *Chevron* deference is unwarranted, the BIA's interpretation is entitled to *Skidmore* deference if it has "the power to persuade." *Flores-Molina*, 850 F.3d at 1158 (discussing *Skidmore*, 323 U.S. 134).

20

## 1. Whether the Statute Is Ambiguous or Silent

Title 8 U.S.C. § 1231(b)(3)(B)(ii) prohibits withholding of removal for an alien who "having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." Mr. Birhanu appears to concede that § 1231 is "ambiguous or silent" as to whether immigration courts may consider an alien's mental health. Rather, Mr. Birhanu focuses his challenge on whether "the BIA has inexplicably departed from its prior decisions regarding the standard for particularly serious crime determinations in an unreasoned, arbitrary, and capricious manner." Pet'r's Br. at 21. Thus, we assume, without deciding, that § 1231 is "ambiguous or silent" as to the issue at hand.[2]

## 2. Whether the Agency's Interpretation is Reasonable

Turning to the heart of Mr. Birhanu's challenge on appeal, we hold that the BIA's decision in *Matter of G-G-S-* was not arbitrary or capricious and is thus entitled to *Chevron* deference. In *Matter of N-A-M-,* the BIA held that "all reliable information may be considered in making a particularly serious crime determination,

___

[2] Section 1231 is likely ambiguous as to what factors immigration courts may consider in their particularly serious crime analysis. As this court has previously observed, "apart from the designation of certain aggravated felonies as 'particularly serious' offenses, the statute contains no limiting language restricting the Attorney General's discretion to label other crimes as 'particularly serious.'" *N-A-M v. Holder*, 587 F.3d at 1056. We recognize, however, the Ninth Circuit's contrary ruling in *Gomez-Sanchez v. Sessions*, in which that court held that a blanket rule against considering an alien's mental health is "contrary to Congress's clearly expressed intent . . . because such categorical rules undermine the ability of the agency to conduct a case-by-case analysis in each case." 892 F.3d 985, 992 (9th Cir. 2018).

including but not limited to the record of conviction and sentencing information." 24 I. & N. Dec. 336, 338 (BIA 2007). *Matter of N-A-M-* did not open the door to information on all topics, however, and, as is relevant here, it made no mention of whether an alien's mental health should be considered. In fact, the BIA in *Matter of N-A-M-* explained that "factors that are subsequent and unrelated to the commission of the offense, such as cooperation with law enforcement authorities," as well as "offender characteristics," may bear on sentencing, but not on the particularly serious crime determination. *Id.* at 343. "All reliable information" thus describes the *sources* of information an immigration judge may consider which focus solely on the particularly serious crime determination. The BIA held that an immigration judge may consider sources of information not used in a criminal proceeding "because there is no reason to restrict the use of reliable information to that used in sentencing once the strictures of the categorical approach are deemed not to apply." *Id.* at 345.

In *Matter of G-G-S-,* the BIA held that "a person's mental health is not a factor to be considered in a particularly serious crime analysis and that adjudicators are constrained by how mental health issues were addressed as part of the criminal proceedings." 26 I. & N. Dec. at 339. The BIA reasoned that:

> *A particularly serious crime analysis is centered on the crime that was committed.* Consequently, the inquiry does not involve an examination of an alien's personal circumstances and equities, such as family or community ties or any risk of persecution in the country of removal. The presence or absence of harm to the victim is also a pertinent factor in evaluating whether a crime was particularly serious. *The language of the statute provides the 'essential key' to determining whether a crime is particularly serious, which is*

22

> *'whether the nature of the crime is one which indicates that the alien poses a danger to the community.' Once an offense is determined to be particularly serious, no separate determination of danger to the community is required.*

*Id.* at 343–44 (citations omitted) (emphasis added).

The BIA then concluded "[w]hether and to what extent an individual's mental illness or disorder is relevant to his or her commission of an offense and conviction for the crime are issues best resolved in criminal proceedings" where "[s]uch fact finders have expertise in the applicable State and Federal criminal law, are informed by the evidence presented by the defendant and the prosecution, and have the benefit of weighing all the factors firsthand." *Id.* at 345. The BIA recognized that criminal courts consider mental health in a variety of circumstances, including competency determinations, insanity defenses, mens rea elements including specific intent, and sentencing. *Id.* The BIA alternatively held that a petitioner's mental condition is irrelevant to "whether the nature of his conviction, the sentence imposed, and the circumstances and underlying facts indicate that he posed a danger to the community." *Id.* at 346. The BIA further reasoned that claiming a violent act was a result of mental illness "does not lessen the danger that his actions posed to others and is therefore not relevant to [whether] his offense is a particularly serious crime." *Id.*

### a. Deviation from Past Practice

The BIA's interpretation of § 1231 in *Matter of G-G-S-* did not deviate from its prior interpretation in *Matter of N-A-M-*, as the two decisions are not in conflict.

As *Matter of G-G-S-* makes clear, although an immigration court may consider evidence "outside the confines of the record of conviction," the particularly serious crime inquiry is still "centered on the crime that was committed." 26 I. & N. Dec. at 343. Thus, even "reliable" evidence of an alien's mental health is not relevant to the serious crime analysis. Further, *Matter of G-G-S-* clarified that *Matter of N-A-M-* only held that "all reliable information *that is relevant* to the [particularly serious crime] determination may be considered." *Id.* (citing *Matter of N-A-M-*, 24 I. & N. Dec. at 342) (emphasis added). In other words, *Matter of G-G-S-* and *Matter of N-A-M-* address distinct, albeit related, issues. Whereas *Matter of N-A-M-* defines the evidentiary rules for what sources of information an immigration court may consider in its particularly serious crime inquiry, *Matter of G-G-S-* emphasizes that the scope and focus of the inquiry is upon the "type and circumstances *of the crime*" and not the personal circumstances *of the alien*. *Id.* at 341 (emphasis added).

Further, the BIA has historically permitted excluding certain evidence, or limiting the particularly serious crime inquiry to certain factors. Indeed, in *Matter of N-A-M-*, the BIA expressly observed that it had, in some instances "focused exclusively on the elements of the offense, i.e., the nature of the crime." 24 I. & N. Dec. at 342. This court has similarly held that the BIA is permitted to forego a separate danger-to-the-community assessment once a crime is deemed particularly

24

serious. *N-A-M v. Holder*, 587 F.3d at 1057. Thus, the BIA's exclusion of mental health evidence does not deviate from its past practice.[3]

Accordingly, we are unpersuaded by the Ninth Circuit's contrary conclusion in *Gomez-Sanchez v. Sessions*, 892 F.3d 985 (9th Cir. 2018).[4] There, the Ninth Circuit held that the BIA's decision in *Matter of G-G-S-* "to constrain the evidence IJs may consider when making a serious crime determination is at least inconsistent with, if not directly in contradiction with its earlier holding permitting consideration of 'all reliable information.'" *Id.* at 995 (citing *Matter of N-A-M-*, 24 I. & N. Dec. at 338, 342). As discussed above, the BIA's approval of "all reliable evidence" in *Matter of N-A-M-* does not permit immigration courts to consider irrelevant evidence. Because the BIA in *Matter of G-G-S-* determined that an alien's mental health is irrelevant

---

[3] The dissent's characterization of mental health evidence as a "singular exception," Dissent at 12, is only accurate if mental health is indeed relevant to the particularly serious crime analysis. Yet, the BIA reasoned that an alien's mental health "does not relate to the pivotal issue in a particularly serious crime analysis, which is whether the nature of his conviction, the sentence imposed, and *the circumstances and underlying facts indicate that he posed a danger to the community*." *Matter of G-G-S-*, 26 I. & N. Dec. at 346 (emphasis added). Further, even if mental health evidence were relevant, the BIA alternatively determined that criminal courts are in a better position than immigration courts to evaluate that evidence in a reliable manner. *Id.* at 345. Although we may question the bases for those decisions, the decisions themselves do not deviate from the BIA's past practices.

[4] After oral argument, the parties filed Rule 28(j) letters acknowledging the Eighth Circuit's decision in *Shazi v. Wilkinson*, __ F.3d __, 2021 WL 503288 (8th Cir. Feb. 11, 2021). In *Shazi*, the Eighth Circuit agreed with the Ninth Circuit's conclusion that "the BIA's categorical bar of consideration of mental health evidence, as contemplated in *Matter of G-G-S-*, is an arbitrary and capricious construction of 8 U.S.C. § 1231." *Id.* at *5.

when addressing whether the crime at issue is a particularly serious crime, that decision does not deviate from the BIA's reliability analysis in *Matter of N-A-M-*.

### b. *Whether Any Deviation Is Adequately Explained*

Further, even if *Matter of G-G-S-* deviated from *Matter of N-A-M-*, the BIA sufficiently explained its reasoning in *Matter of G-G-S-*. We reiterate that our review is one of reasonableness. *N-A-M v. Holder*, 587 F.3d at 1056. The BIA does not need to show that its interpretation is the "best" interpretation, or even merely "better" than its prior interpretation. *See Brand X*, 545 U.S. at 980; *Fox Television Stations*, 556 U.S. at 515.

We conclude that it is not arbitrary or capricious for immigration courts to defer to criminal courts regarding an alien's mental health at the time the crime was committed given the criminal court's "expertise in the applicable State and Federal criminal law," that court's firsthand consideration of the evidence, and other factors presented in an adversarial proceeding. *Matter of G-G-S-*, 26 I. & N. Dec. at 345. Whether immigration courts *also* have the institutional capacity to consider issues of mental health does not make deference to criminal court rulings unreasonable. Alternatively, it is not arbitrary and capricious for immigration courts to treat mental health evidence as irrelevant when determining whether a crime is a particularly serious crime.

Accordingly, we must again disagree with the Ninth Circuit's conclusion that BIA's reasoning in *Matter of G-G-S-* was "flawed." *Gomez-Sanchez*, 892 F.3d at 993. First, the Ninth Circuit reasoned that an immigration court should not need to

defer to a criminal court's fact finding because the immigration court may look to mental health evidence without reassessing "criminal culpability or the validity of conviction." *Id.* Instead, according to the Ninth Circuit, the immigration court may consider mental health "as part of the separate determination of dangerousness," and that dangerousness determination may indicate "ultimately whether the individual committed a particularly serious crime." *Id.* at 993–94. Second, the Ninth Circuit indicated that deference to the criminal court was unreasonable because "the mental health evidence the individual wishes to offer in the immigration court may never have been presented to the criminal court." *Id.* at 994.

The BIA's reasoning in *Matter of G-G-S-* was not flawed. It was not arbitrary or capricious for the BIA to conclude that immigration courts may not reconsider mental health evidence "as part of the separate determination of dangerousness." *Id.* at 993–94. As this court recognized in *N-A-M v. Holder*, § 1231(b)(3)(B)(ii) requires *only* an inquiry into whether the alien has committed a particularly serious crime and "no separate danger-to-the-community assessment is required under the statute." 587 F.3d at 1057. If an immigration court determines that an alien's offense is particularly serious, mental health evidence bearing on the alien's dangerousness becomes irrelevant.

Nor was it arbitrary or capricious for the BIA to conclude that immigration courts must limit their consideration of mental health evidence to that presented before the criminal court. *Matter of G-G-S-* recognized that allowing immigration courts to consider mental health evidence not admitted in the criminal court is

27

problematic because only the criminal court has "the benefit of weighing all the factors firsthand." 26 I. & N. Dec. at 345. Further, the BIA recognized that the criminal court may consider mental health evidence at a variety of stages in a variety of contexts, including competency determinations, affirmative defenses, sentencing, and post-conviction appeals. *Id.* Permitting immigration courts to consider mental health evidence that the criminal court did not review firsthand, despite ample opportunity to do so, may lead to the second-guessing of the criminal court's rulings which the BIA sought to avoid. Again, although there may be good policy reasons for immigration courts to consider evidence not presented to the criminal court, the BIA did not act arbitrarily or capriciously in limiting immigration courts to a criminal court's "firsthand" consideration.

The Ninth Circuit and Mr. Birhanu criticize the BIA for limiting its consideration of mental health, while still considering evidence of "evil intent or fraud" or whether conduct was "inherently base, vile, or depraved." *See Gomez-Sanchez*, 892 F.3d at 996. Yet, the BIA considered this issue, determining that "since the focus in a particularly serious crime analysis is whether the offense justifies a determination that the respondent 'is a danger to the community,' an inquiry regarding evil intent or fraud is not necessarily dispositive." *Matter of G-G-S-*, 26 I. & N. Dec. at 347. Although the BIA could certainly have determined that mental health, like evil intent, may (or even should) be pertinent, and thus considered, its determination to the contrary was not arbitrary or capricious. As the BIA reasoned, a

28

claim that an alien's "violent act was a result of his mental illness does not lessen the danger that his actions posed to others." *Id.* at 346.

That "the presence of mental disability undoubtedly could affect the [immigration] court's perception of the nature of the crime and therefore the determination of dangerousness" is also inapposite. Pet'r's Br. at 25. As discussed above, the BIA was reasonably concerned that immigration courts might otherwise perceive the nature of the crime differently than criminal courts, and thus immigration courts should be "constrained by how mental health issues were addressed as part of the criminal proceedings." *Matter of G-G-S-*, 26 I. & N. Dec. at 349. Further, the BIA reasonably analogized mental health evidence to other sentencing factors, such as cooperation with law enforcement or "offender characteristics," because both mental health evidence and sentencing factors bear on the culpability of *the defendant*, but "do not diminish the gravity *of a crime*." *Matter of N-A-M-*, 24 I. & N. Dec. at 343 (emphasis added). Here, Mr. Birhanu's mental illness similarly may have affected his sentence, but, at least arguably, did not affect the seriousness of the crimes charged.

In short, *Matter of G-G-S-* may not provide the most obvious framework for determining whether an offense is a "particularly serious crime." Further, Mr. Birhanu's criticisms of that decision, as well as the criticism voiced by the Ninth Circuit in *Gomez-Sanchez*, are well taken. But, "[o]ur precedent requires us to defer to the BIA's reasonable construction of § 1231, and we abide by it here." *N-A-M v. Holder*, 587 F.3d at 1060 (Henry, J., concurring).

29

Because we afford the BIA deference under *Chevron*, we decline to address whether deference under *Skidmore* is appropriate.

### 3. Application of *Matter of G-G-S-*

Mr. Birhanu's alternative assertion that the BIA misapplied *Matter of G-G-S-* is without merit. Specifically, Mr. Birhanu faults the BIA for failing to consider his mental health to the extent it was considered by the criminal court in his plea of "guilty but mentally ill." Pet'r's Br. at 26. Although the BIA did not itself specifically explain its reasoning in its decision, the BIA "adopt[ed] and affirm[ed] the [IJ's] determination that [Mr. Birhanu's] convictions bar him from asylum and withholding of removal." AR at 8. Because the BIA explicitly incorporated the IJ's determination, we may look to the IJ's reasoning "to better understand the BIA's decision." *Brue*, 464 F.3d at 1234 n.5.

The IJ correctly applied *Matter of G-G-S-*. First, the IJ recognized Mr. Birhanu's plea of "guilty but mentally ill," yet also recognized that under Utah law, his plea "was a consideration limited to sentencing and not [Mr. Birhanu's] culpability." AR at 113; *see also* Utah Code Ann. §§ 77-16a-103, -104. The IJ also noted that Mr. Birhanu's "mental health was considered by the criminal court, but it was determined that [Mr. Birhanu] was guilty of making threats of terrorism and did not exculpate him." *Id.* at 115 (citing *Matter of G-G-S-*, 26 I. & N. Dec. 339). Second, the IJ recognized the sentence imposed by the criminal court, ostensibly reflecting the criminal court's consideration of Mr. Birhanu's plea and mental health. Yet, the IJ "[found] significant that [Mr. Birhanu] was sentenced to an indeterminate

30

sentence not to exceed five years." *Id.* Thus, the IJ properly applied *Matter of G-G-S-* by only considering the criminal court's treatment of Mr. Birhanu's mental illness as reflected in his plea and sentence, and by declining to independently consider Mr. Birhanu's mental illness in its serious crime analysis. To the extent Mr. Birhanu asserts the IJ should have weighed the mental health evidence reflected in his plea and sentence differently, "we cannot reweigh the evidence to determine if the crime was indeed particularly serious." *Brue*, 464 F.3d at 1232.[5]

On nearly identical grounds, Mr. Birhanu also challenges the BIA's determination that he is ineligible for asylum. Under 8 U.S.C. § 1158(a)(2)(A)(ii) any alien who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States" is ineligible for asylum. Neither party asserts that the particularly serious crime determination for

---

[5] The dissent asserts: "The Board uncritically applied a precedent, *G-G-S-*, which barred consideration of mental illness as inconsistent with a finding of guilt." Dissent at 6–7. This argument is unexhausted and without merit. As the dissent points out, Mr. Birhanu argued before the BIA, "[j]ust as the Utah court considered Mr. Birhanu's mental illness in his criminal proceedings, so should the immigration court here." Dissent at 8 (quoting AR at 32). Yet, this argument is not a request that the BIA decline to apply *Matter of G-G-S-*. Rather, it is a request that the BIA apply *Matter of G-G-S-*, and do so correctly. Similarly, Mr. Birhanu's request that the BIA "apply the proper standards" leaves unclear whether Mr. Birhanu wanted the BIA to distinguish *Matter of G-G-S-* from his particular case, or to merely apply *Matter of G-G-S-* "properly." AR at 32. We conclude that the former argument is unexhausted because it was not made with sufficient specificity. *See Garcia-Carbajal*, 625 F.3d at 1238 ("To satisfy [the exhaustion requirement under] § 1252(d)(1), an alien must present the *same specific legal theory* to the BIA before he or she may advance it in court.") (emphasis in original). Further, nothing in *Matter of G-G-S-* indicates that it is meant to apply only to certain types of convictions in certain states. Thus, the BIA's decision to apply its own binding precedent was not "arbitrary."

31

Mr. Birhanu's asylum claim differs from that for his withholding of removal claim. Further, although *Matter of G-G-S-* focused its attention on withholding of removal under § 1231, the BIA remarked that its decision "would also apply to aliens who may be eligible for asylum." 26 I. & N. Dec. at 347 n.6. Because we afford the BIA's ruling in *Matter of G-G-S-* deference under *Chevron* for the reasons set forth above, we must also affirm the BIA's ruling that Mr. Birhanu is ineligible for asylum.

We decline to consider Mr. Birhanu's claim that Section 504 of the Rehabilitation Act requires the BIA to consider evidence of his mental health. As discussed above, Mr. Birhanu's Section 504 claim was not administratively exhausted, and is thus subject to dismissal.

### D. Relief Under the CAT

Finally, Mr. Birhanu asserts that the IJ either failed to consider, or misconstrued, evidence in denying his CAT claim. To warrant relief under the CAT, an applicant must show it is more likely than not he will be subject to torture in his country by, at the instigation of, or with the acquiescence of a public official or one acting in an official capacity. 8 C.F.R. §§ 1208.16–18. We review the agency's determination of a CAT claim for substantial evidence. *Nasrallah*, 140 S. Ct. at 1688.

The IJ's conclusion was supported by substantial evidence. The IJ found that Mr. Birhanu "has family support to access treatment that would diminish the likelihood that [he] would regress back to when he was not taking medication." AR

32

at 118. In support, the IJ relied on Mr. Birhanu's testimony that his uncle and sister took him to a hospital for treatment; that Mr. Birhanu understands the importance of managing his mental health; and that "mentally ill persons with no kind of family structure are even worse hit and end up on the street and ultimately a burden on society." AR at 118. The IJ also found that Mr. Birhanu is unlikely to be imprisoned or institutionalized even after acknowledging reports of "police misconduct and severe prison conditions." *Id.* Although Mr. Birhanu correctly identifies impediments to treatment in Ethiopia and how lack of treatment may expose him to abuse, a reasonable adjudicator could find Mr. Birhanu's family support and access to other medications make it less likely than not that Mr. Birhanu will be tortured.

Nor did the IJ overlook or misconstrue contrary evidence in reaching its conclusion. The IJ expressly noted Mr. Birhanu's testimony that "he was required to sit all day, did not have others to interact with, and, on one occasion, a man slapped him claiming to have done so because he was slapping the devil." AR at 116. The IJ also recognized that evidence "that Ethiopia's security forces engage in unlawful conduct and that prison conditions are a concern." AR at 118. The IJ also considered "evidence that there is societal discrimination against persons with disabilities." *Id.* The IJ also expressly considered Mr. Birhanu's psychologist's report and testimony, as well as the human rights reports and articles about health care and human rights in Ethiopia. AR at 117–18. Further, the IJ recognized that Mr. Birhanu's medication "is not as easily accessible in Ethiopia [as it is in the United States]." AR at 117. In short, our review of the record leads us to conclude

33

the IJ carefully weighed the evidence presented, even if the IJ did not discuss that evidence with the granularity Mr. Birhanu might prefer.

## IV

For the foregoing reasons, we DISMISS petitioner's claims under Section 504 of the Rehabilitation Act as unexhausted and DENY the balance of his petition for review.

*Thewodros Wolie Birhanu v. Robert M. Wilkinson*, 19-9599
**BACHARACH**, J., concurring in part and dissenting in part.

I join all of the majority's opinion except Part III(C). In this part, the majority upholds the Board of Immigration Appeals' categorical disregard for any evidence of mental illness when determining whether a crime is particularly serious. In upholding the Board's disregard for evidence of mental illness, the majority creates a circuit split. *See Shazi v. Wilkinson*, No. 19-2842, slip op. at 4–10 (8th Cir. Feb. 11, 2021) (to be published); *Gomez v. Sessions*, 892 F.3d 985, 990–96 (9th Cir. 2018). The other circuits' approach makes particular sense here.

When considering whether a crime is particularly serious, the Board of Immigration Appeals generally permits immigration judges to consider all of the circumstances of the crime as relevant. But the Board applies a single exception—mental illness—even when the criminal court finds that the noncitizen offender was mentally ill at the time of the offense.

The Board created this exception when considering a conviction in California, where a finding of guilt might conflict with a finding of mental illness. *Matter of G-G-S-*, 26 I. & N. Dec. 339 (BIA 2014). But Mr. Birhanu was convicted in Utah, which authorizes the criminal court to find that a person is guilty and was mentally ill when the offense took place. Utah Code Ann. § 77-16a-103(3)(a), (4).

Based on this authorization, Mr. Birhanu pleaded guilty but mentally ill; and the criminal court accepted his plea with a finding that he was mentally ill when he committed the offenses. Despite this finding, the Board of Immigration Appeals refused to permit independent consideration of Mr. Birhanu's mental illness, reasoning in part that the criminal court's finding of guilt conflicted with the presence of a mental illness. This reasoning made no sense because the criminal court had found that Mr. Birhanu was mentally ill when he committed the offenses.

The Board also reasoned that mental illness is always irrelevant. But the Board continues to allow consideration of the noncitizen's intent when committing the offense. How is one mental state (intent) relevant and another mental state (mental illness) always irrelevant?

Respectfully, I think that both of the Board's rationales are arbitrary.

1. **The Board analyzed the facts involved in Mr. Birhanu's crimes to conclude that they were particularly serious.**

A noncitizen is ineligible for asylum and withholding of removal when convicted of a "particularly serious crime." 8 U.S.C. § 1231(b)(3)(B)(ii) (withholding of removal); 8 U.S.C. § 1158(b)(2)(A)(ii) (asylum). A crime is considered particularly serious based on

(1)　a statutory characterization as an aggravated felony, 8 U.S.C. § 1231(b)(3)(B)(ii) (withholding of removal); 8 U.S.C. § 1158(b)(2)(B)(i) (asylum),

2

(2)     a regulatory characterization as a *per se* particularly serious crime, 8 U.S.C. § 1158(b)(2)(B)(ii) (asylum), or

(3)     the underlying facts, *N-A-M- v. Holder*, 587 F.3d 1052, 1056 (10th Cir. 2009) (withholding of removal); *Matter of G-G-S-*, 26 I. & N. Dec. at 343, 347 n.6 (discussing withholding of removal and observing that the same analysis applies to asylum).[1]

Mr. Birhanu's offenses consisted of threatening terrorism at the university he attended. These offenses didn't qualify as aggravated felonies or *per se* particularly serious crimes, so the Immigration Judge and the Board considered the underlying facts, including

- how long Mr. Birhanu's sentences had been,

- what he had said when making the threats,

- how long the criminal conduct had lasted, and

- how the university had responded to the threats.

Immigration Judge's Ruling at 8; *see* Board Decision at 6 (adopting the Immigration Judge's decision and reasoning).[2]

---

[1]     Like the majority, I would apply the same standard when determining Mr. Birhanu's eligibility for asylum and withholding of removal. *See Bastardo-Vale v. Att'y Gen.*, 934 F.3d 255, 265–67 (3d Cir. 2019) (en banc) (applying the same standard when determining whether a crime is particularly serious for eligibility for asylum or withholding of removal); *Vetcher v. Barr*, 953 F.3d 361, 369 (5th Cir. 2020) (concluding that classification of a crime as "particularly serious" should be the same for eligibility involving asylum and withholding of removal).

[2]     The Court reviews the Board's decision as the final agency determination. *Flores-Molina v. Sessions*, 850 F.3d 1150, 1157 (10th Cir. 2017). But we consult the "[Immigration Judge's] opinion to the extent that the [Board] relied upon or incorporated it." *Sarr v. Gonzales*, 474 F.3d 783,

3

**2.     Our review is de novo.**

We conduct de novo review of the Board's legal interpretation of a
"particularly serious crime." *N-A-M- v. Holder*, 587 F.3d 1052, 1055 n.2
(10th Cir. 2009).

**3.     Two kinds of deference exist.**

In conducting de novo review, the majority assumes that the statute
is ambiguous or silent on whether the Immigration Judge can consider a
noncitizen's mental illness when determining whether a crime is
particularly serious. Maj. Op. at 20–21 & n.2. I too would make this
assumption.

With this assumption, we must decide whether to defer to the Board's
application of the exception for mental illness. Deference may be required
under the Supreme Court's opinion in *Chevron, U.S.A., Inc v. Natural
Resources Defense Council, Inc.*, 467 U.S. 837 (1984) or *Skidmore v. Swift
& Co.*, 323 U.S. 134 (1944).

An unpublished Board decision, like the one here, is not ordinarily
entitled to *Chevron* deference. *Flores-Molina v. Sessions*, 850 F.3d 1150,
1157 (10th Cir. 2017). But the Board relied on a published opinion: *Matter*

---

790 (10th Cir. 2007). Here the Board "adopt[ed] and affirm[ed]" the
Immigration Judge's conclusion that Mr. Birhanu had committed
particularly serious crimes "[f]or the reasons stated in [the Immigration
Judge's] decision." Board Decision at 6.

4

*of G-G-S-*, 26 I. & N. Dec. 339 (BIA 2014). In *G-G-S-*, the Board had addressed the same question that arises here: the potential relevance of a noncitizen's mental illness when determining whether a crime is particularly serious. Board Decision at 7; *Matter of G-G-S-*, 26 I. & N. Dec. at 345–47. Because that question is the same as ours, we must consider the availability of *Chevron* deference. *Flores-Molina*, 850 F.3d at 1157–58.

*Chevron* deference would be appropriate only if the Board's construction of the statute were permissible. *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). We'd consider the construction of the statute impermissible if the Board's reasoning was arbitrary or capricious. *Mayo Found. for Med. Educ. & Research. v. United States*, 562 U.S. 44, 53 (2011).

If we decide not to defer under *Chevron*, we must consider whether deference would be appropriate under *Skidmore*. *See Flores-Molina v. Sessions*, 850 F.3d 1150, 1158 (10th Cir. 2017) (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). We defer under *Skidmore* only if persuaded by the Board's reasoning. *Gonzales v. Oregon*, 546 U.S. 243, 268–69 (2006).

**4.** **We should decline to defer under *Chevron* because the Board arbitrarily applied its prior precedent in *G-G-S-* despite the difference in Mr. Birhanu's circumstances.**

In determining whether a crime is particularly serious, the Board starts with the elements of the crime. If the elements might bring the offense within the ambit of a particularly serious crime, the Board can independently consider the underlying circumstances. *In Re N-A-M-,* 24 I. & N. Dec. 336, 337–38, 342 (BIA 2007). The Board has generally taken an expansive approach, embracing consideration of the "totality of the circumstances . . . concerning th[e] crime." *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982).

From these circumstances, however, the Board has carved out one exception—mental illness—prohibiting an immigration judge from considering the existence or impact of mental illness when deciding whether a crime is particularly serious. *Matter of G-G-S-,* 26 I. & N. Dec. at 339, 345–48 (BIA 2014). The Board acted arbitrarily by applying this exception to Mr. Birhanu.

**A.** **Consideration of Mr. Birhanu's mental illness would not have required the Board to second guess the criminal court.**

Though immigration judges can consider every other circumstance of the crime, they cannot ever independently consider a mental illness. Why this singular exception? The Board uncritically applied a precedent, *G-G-*

6

*S-*, which barred consideration of mental illness as inconsistent with a finding of guilt.

*G-G-S-* addressed a conviction in California. Under California law, "it is fundamental . . . that an individual with a mental condition that renders that person legally 'insane' cannot be convicted of acts performed while suffering from that condition." *Matter of G-G-S-*, 26 I. & N. Dec. 339, 346 (BIA 2014) (citing *People v. Kelly*, 516 P.2d 875, 881-83 (Cal. 1973)). And the *G-G-S-* Board pointed out that "[n]o such finding [had been] made in the [noncitizen's] criminal case." *Matter of G-G-S-*, 26 I. & N. Dec. 339, 346 (BIA 2014). So the *G-G-S-* Board concluded that independent consideration of mental illness would always involve second guessing the criminal court. *Id.* at 345–46.

But not all convictions are from California or are silent on the existence of a mental illness. For example, we are determining whether to defer to the Board's application of *G-G-S-* to Utah convictions based on a finding of "guilt[] with a mental illness at the time of the offense." Utah Code Ann. § 77-16a-103(3)(a).

Mr. Birhanu invoked this provision in Utah law, pleading guilty but mentally ill. The criminal court accepted the plea, entering convictions and finding that Mr. Birhanu was mentally ill when he committed the offenses. *See* Utah Code Ann. § 77-16a-103(3)(a), (4).

7

Given that finding, Mr. Birhanu argues that it made no sense for the Board to view assessment of a mental illness as inconsistent with the criminal court's finding of guilt. The majority denies exhaustion of this argument, stating that Mr. Birhanu didn't argue to the Board that it should decline to apply *G-G-S-* in his case. Maj. Op. at 31 n.5.

I respectfully disagree with the majority's interpretation of the brief that Mr. Birhanu submitted to the Board. There he made two arguments. He first challenged the correctness of *G-G-S-*. R. at 30–31. But he then argued that even if *G-G-S-* had been correctly decided as to the petitioner in that case, *G-G-S-* didn't create "the proper standard[]" here because the reasoning made no sense when applied to his conviction:

> Additionally, the Utah criminal court explicitly recognized that Mr. Birhanu's case should be treated differently from the ordinary criminal case, as Mr. Birhanu was treated at the Utah State Hospital rather than sent to jail. The criminal court also accepted Mr. Birhanu's plea as "guilty, but mentally ill." Mr. Birhanu was initially charged with a second-degree felony, but the severity was lowered . . . . Just as the Utah court considered Mr. Birhanu's mental illness in his criminal proceedings, so should the immigration court here.

> Moreover, considering information that relates to Mr. Birhanu's mental health does not require the [Immigration Judge] to consider his culpability or second-guess the conviction. The [Immigration Judge] instead is considering Mr. Birhanu's mental health at the time of the commission of the crime in order to determine whether he currently poses a danger to anyone for purposes of the [particularly serious crime] determination . . . . The Board should apply *the proper standards* and find that Mr. Birhanu's conviction is not a [particularly serious crime].

8

*Id.* at 31–32 (citations omitted) (emphasis added).

I agree with Mr. Birhanu. As the majority points out, *G-G-S-* said that when deciding whether to classify a crime as particularly serious, immigration judges "are constrained by how mental health issues were addressed as part of the criminal proceedings." Maj. Op. at 22 (quoting *Matter of G-G-S-*, 26 I. & N. Dec. 339 (BIA 2014)). But Mr. Birhanu's criminal court found that he was mentally ill when he committed the offenses; he just wanted the Immigration Judge and the Board to consider a circumstance of the crimes that the criminal court had specifically found.

Given the marked difference between consideration of mental illness in criminal proceedings in California and Utah, reliance on *G-G-S-* to prohibit consideration of Mr. Birhanu's mental illness was arbitrary, preventing *Chevron* deference. *See Mellouli v. Lynch*, 135 S. Ct. 1980, 1989 (2015) ("Because it makes scant sense, the BIA's interpretation . . . is owed no [*Chevron*] deference . . . .").

## B. The Board lacks a cogent explanation for continuing to consider intent potentially relevant but prohibiting any consideration of mental illness.

In *G-G-S-*, the Board also reasoned that the existence of a mental illness does not lessen the danger to others. *Matter of G-G-S-*, 26 I. & N. Dec. 339, 346 (2014). But this reasoning also made no sense, for the Board continues to consider intent to harm in determining whether a crime is particularly serious. *See id.* at 347 (recognizing that it may be appropriate

9

to consider whether a crime was particularly serious because it was "inherently base, vile, or depraved"); *Matter of L-S-*, 22 I. & N. Dec. 645, 655–56 (BIA 1999) (considering a lack of intent to harm when assessing whether a crime is particularly serious); *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982) (stating that intent to commit theft bears on whether the crime is particularly serious); *In Re: Paul Ojekwe*, 2007 WL 2463951, at *2 (BIA Aug. 3, 2007) (unpublished) (considering intent to defraud as pertinent to classification of a crime as particularly serious); *see generally* Fatma Marouf, *A Particularly Serious Exception to the Categorical Approach*, 97 B.U. L. Rev. 1427, 1448 (2017) (stating that "the [Board of Immigration Appeals] has indicated that evil intent is relevant to the particularly serious crime determination"). Why would intent be relevant and mental illness always be irrelevant? *See Sauers v. Salt Lake Cty.*, 1 F.3d 1122, 1129–30 (10th Cir. 1993) (stating that mental illness is relevant to the existence of an intent to violate the Fourteenth Amendment); *see also Gomez-Sanchez v. Sessions*, 892 F.3d 985, 995–96 (9th Cir. 2018) (vacating *Matter of G-G-S-* in part on this ground).

The majority maintains that *G-G-S-* explained the anomaly by observing that an "inquiry regarding evil intent or fraud is not necessarily dispositive" when considering whether a crime is particularly serious. Maj. Op. at 28 (quoting *Matter of G-G-S-*, 26 I. & N. Dec. at 347). But this observation does not explain the Board's prohibition against independent

10

consideration of mental illness. We know from the Board that evil intent is relevant even if it isn't "necessarily dispositive." *See* pp. 9–10, above. Why would mental illness be any different? *See Shazi v. Wilkinson*, No. 19-2842, slip op. at 10 (8th Cir. Feb. 11, 2021) (to be published) ("[W]e fail to understand how a petitioner's mental health can *never* be relevant to 'the circumstances and underlying facts' of the conviction, especially as the BIA noted, in light 'of the impact mental health can have on an individual's behavior.'" (emphasis in original)).

Because intent remains pertinent, one would expect the Board to allow consideration of all of the circumstances bearing on intent, including the offender's mental illness. But the Board treats intent and mental illness far differently. Perhaps an explanation exists. But the Board hasn't provided an explanation, and I can't imagine what it would be.

C.    **The Board's practice invites independent consideration of all circumstances involving the crime (apart from the offender's mental illness), not just "sources of information" deemed reliable.**

Mr. Birhanu points out that the Board has allowed immigration judges to consider "all reliable information." *In re N-A-M-*, 24 I. & N. Dec. 336, 337–38 (BIA 2007). The majority reasons that the Board was simply referring to evidentiary rules about the sources of information for an immigration judge. For example, the majority states that the Board has suggested that it will disregard sentencing information and offender

11

characteristics when determining whether a crime is particularly serious. I respectfully disagree with the majority.

The Board has said that immigration judges may independently consider all of the relevant case-specific circumstances of the underlying offense. *See Matter of R-A-M-*, 25 I. & N. Dec. 657, 659 (BIA 2012) (stating that the Board considers "the circumstances and underlying facts of the conviction" (quoting *Matter of N-A-M-*, 24 I. & N. Dec. 336, 342 (BIA 2007))); *Matter of L-S-*, 22 I. & N. Dec. 645, 649 (BIA 1999) (stating that the Board considers whether "the circumstances and underlying facts of the conviction" indicate that the noncitizen is a danger to the community); *Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982) (stating that the Board considers "the totality of the circumstances . . . concerning [the] crime" to determine whether it was particularly serious). Indeed, the Board has recognized that "[i]mmigration judges are often called upon to examine the facts underlying a conviction to determine whether the alien is ineligible for . . . withholding of removal as one convicted of a 'particularly serious crime.'" *In the Matter of Jonet Dominguez-Rodriguez*, 26 I. & N. Dec. 408, 413 n.9 (BIA 2014).

So whatever the Board meant when referring to "all reliable information," the Board has broadly permitted independent consideration of all relevant case-specific circumstances of the offense. The *G-G-S-* Board created a singular exception, the existence of a mental illness,

12

without explanation.[3] This singular exception is arbitrary. *Shazi v. Wilkinson*, No. 19-2842, slip op. at 10 (8th Cir. Feb. 11, 2021) (to be published).

**D.    The Board doesn't exclude consideration of sentencing factors in effect at the time of the offense.**

The majority also observes that some of the case-specific circumstances might affect the sentence but lack any bearing on the seriousness of the crime. For example, the majority notes that an offender's cooperation with law enforcement can reduce the sentence without bearing on the seriousness of the crime. *Matter of N-A-M-*, 24 I. & N. Dec. 336, 343 (BIA 2007). The same is true of some offender characteristics. For example, "the fact that [a noncitizen] has no prior

---

[3]    The majority contends that

- the Board permits, but does not require, independent consideration of the facts underlying a noncitizen's offense and

- the *G-G-S-* Board did not deviate from past practice by categorically prohibiting independent consideration of the facts of a noncitizen's mental health.

Maj. Op. at 24–25 But permitting disregard of a fact is different from prohibiting consideration. The *G-G-S-* Board didn't just permit disregard of mental illness; the Board prohibited its consideration.

convictions is irrelevant to the 'particularly serious crime' calculus." *In re Matter of Y-L-, A-G-, & R-S-R-*, 23 I. & N. Dec. 270, 277 (AG 2002).

But the Board has never categorically prohibited immigration judges from considering sentence-related factors. Indeed, both the Immigration Judge and the Board considered Mr. Birhanu's sentences as pertinent to the seriousness of his crimes.

\* \* \*

The Board has continued to embrace an inclusive approach when considering whether a crime is particularly serious. To the Board, all of the circumstances bearing on the crime are potentially relevant except for the offender's mental illness. The Board reasoned that (1) consideration of mental illness would conflict with the conviction and (2) intent isn't dispositive. In my view, this reasoning is arbitrary.

When Mr. Birhanu was convicted, his criminal court found a mental illness at the time of his offenses. Yet the Board refused to allow consideration of Mr. Birhanu's mental illness in part to avoid a conflict with the criminal court's findings. This reasoning disregards the criminal court's finding that Mr. Birhanu was mentally ill when he committed the offenses.

The Board also reasoned that intent wasn't dispositive. But the Board has continued to consider intent as potentially relevant. In my view, it's arbitrary to permit consideration of one mental state (intent) and prohibit

14

immigration judges from considering another mental state (mental illness). So *Chevron* deference does not apply.

**5.    Because the Board arbitrarily applied the exception for mental illness, we should decline to defer under *Skidmore*.**

The arbitrariness of the Board's reasoning also prevents deference under *Skidmore*. *See Flores-Molina v. Sessions*, 850 F.3d 1150, 1167 (10th Cir. 2017) (concluding that *Skidmore* deference did not apply for the same reasons that *Chevron* deference did not apply).

**6.    Conclusion**

Given the arbitrariness of the Board's decision to exclude consideration of Mr. Birhanu's mental illness, I would remand for the Board to reconsider his eligibility for asylum and withholding of removal.